**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**April 6, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

OMON UANRERORO,

　　　　　Petitioner,

v.

ALBERTO R. GONZALES,

　　　　　Respondent. *

No. 04-9537

**APPEAL FROM THE EXECUTIVE OFFICE**
**OF IMMIGRATION REVIEW**
**BOARD OF IMMIGRATION APPEALS**
**(AGENCY NO. A 79-659-620)**

Patrick C. Hyde, Patrick C. Hyde, P.C., Denver, Colorado, for Petitioner.

James E. Grimes (Anthony W. Norwood, Senior Litigation Counsel, Virginia Lum, Attorney, Peter D. Keisler, Assistant Attorney General, and Terri J. Scadron, Assistant Director, with him on the briefs), United States Department of Justice, Office of Immigration Litigation, Washington, District of Columbia, for Respondent.

Before **HENRY** , **McKAY** , and **TYMKOVICH** , Circuit Judges.

---

* Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Respondent requests that Alberto R. Gonzales be substituted for John Ashcroft as the respondent in this case.

**TYMKOVICH** , Circuit Judge.

Petitioner Omon Uanreroro is a native and citizen of Nigeria who presently lives in Littleton, Colorado. She sought asylum in the United States claiming that she faces the prospect of female genital mutilation if she is returned to her native country. She challenges the Board of Immigration Appeals' decision affirming the Immigration Judge's finding that she did not present sufficiently credible claims for (1) asylum, (2) withholding of removal under the Immigration and Nationality Act (INA), and (3) withholding of removal under the United Nations Convention Against Torture.[1] We agree with Uanreroro that the agency decision was not based upon substantial evidence. Having jurisdiction under 8 U.S.C. § 1252(a), we REVERSE the agency's decision and REMAND for further proceedings consistent with this opinion.

## I. Background

---

[1] Congress changed the statutory language of the INA to "restriction on removal," 8 U.S.C. § 1231(b)(3), but the corresponding regulations retain the old phrase "withholding of removal." 8 C.F.R. § 208.16(b). In addition, the Convention Against Torture, which is implemented by regulation only, still employs the term "withholding of removal." 8 C.F.R. § 208.16(c). For consistency and convenience of reference, we will continue to use "withholding of removal."

Omon Uanreroro, through her asylum application and testimony before the immigration judge, alleges the following facts: Uanreroro fled her homeland to escape the local tribal practice of female genital mutilation (FGM). She came from a tribe that inhabited a village called Uzebba, located in Edo State in southwest Nigeria. She described the practice of "female circumcision" as a ritual performed to "initiate young women into adulthood" prior to marriage. R. at 342. The ceremony required an oath of virginity. If a woman about to be circumcised was discovered or believed to be unchaste, she would be publicly humiliated and tormented. She would be marched naked throughout the town, while the inhabitants would gather and chant songs of infidelity. The woman would then be stoned and cane-whipped. Finally, she would be ostracized and sent into what the tribe called an "evil forest" for twenty-one days of "spiritual cleansing." R. at 347. In many cases, the woman would never return alive. [*Id.*]

Some time in the year 2000, Uanreroro was scheduled to be circumcised along with the other women of her age group in order to become eligible for marriage. Her father warned her that she must be a virgin to take part in the ritual or else she would be killed. Before the arranged ceremony, Uanreroro confided in her mother that she was not a virgin, and her mother helped her to escape from the village with some local traders. After fleeing to the state of Kano, Uanreroro was taken in by a seemingly sympathetic police sergeant, but he abused her

-3-

physically and sexually, and eventually turned her over to the authorities of her home village.

Upon her return, Uanreroro was punished for her attempt to escape. First, she was beaten and locked in a dark room for two days. Next, the chief priest took her to the "evil forest," where he tied her to a tree, cut her body and inserted a black powder in the wounds. He also forced her to drink blood. She was then left in the forest for three days without food or water. When the chief priest arrived at the end of the three-day period, he told Uanreroro that she must wait until the full moon for the final (and most dangerous) stage of the ritualistic cleansing. This stage would begin with a ceremony that required killing a seven-day-old baby and bathing Uanreroro with the baby's blood. Then Uanreroro would be left in the "evil forest" for the traditional twenty-one-day cleansing period.

Before the full moon arrived, Uanreroro learned that her father, who was a tribal chief, had arranged for her to marry the chief priest so that, if she survived the cleansing period, she was to be circumcised in preparation for that marriage. In response, Uanreroro's mother crafted a second plan of escape—this time borrowing money so she could pay to obtain a visa for Uanreroro and have her taken to Europe. While the details of her travel are not clear, the record indicates Uanreroro arrived in France on September 25, 2000, where she stayed for two

weeks until her money supply was depleted. She then contacted a family friend in Rotterdam, Holland. He opened his home to her, and she lived with his family for eight months. At this point, she was confronted by a group of native Nigerians who learned of her attempt to evade the circumcision ritual and threatened to return her to her home village.

Because of this, Uanreroro fled to the United States. She entered the country on July 12, 2001, with a man who allowed her to use his wife's British passport. When the immigration inspector denied her admission, Uanreroro applied for asylum and related forms of relief from removal.

## II. Procedural History

Uanreroro has consistently argued that she is entitled to relief from removal for the following reasons as set forth in her asylum application:

> Due to my refusal to take part in the female circumcization [sic] and my refusal to marry one of the chief priest [sic] in my village, and based on the fact that I ran away, I will be seriously beaten, defamed and will be killed while my body will be offered as sacrifice/rituals in the evil forest in Uzebba my village.

R. at 344.

In support of her claim, Uanreroro submitted various documents to the presiding immigration judge (IJ), including letters from family and friends, an affidavit sworn to by her mother, and a letter that purported to be from a chief of her village demanding her return. All of these documents addressed the

circumstances surrounding her escape from Nigeria and the reasons for it. Additionally, she submitted a medical report from her doctor in the United States, which noted "several black marks on the anterior and posterior chest wall" and "several scars of unknown age" on Uanreroro's hands, arms and legs. R. at 286.

The IJ found this evidence to be of limited usefulness as corroboration of her claims. The IJ concluded that the letters written by friends and family, which were dated after Uanreroro left Nigeria, were "obviously composed in contemplation of the application for asylum" as opposed to contemporaneous evidence of the circumstances in her home country. *See* IJ Dec., Dec. 9, 2002, at 3. As for the letter allegedly written by a chief from her village, it was typewritten, and the IJ found that it bore "no indicia of authenticity" recognizable by the immigration court. *Id*. The IJ did not specifically address the medical report in its decision.

Without this corroborating evidence, the IJ acknowledged that Uanreroro's claim would "stand or fall" on her credibility. *Id.* The IJ determined that Uanreroro did not present credible claims for relief and announced an oral decision listing five reasons for its conclusion: (1) the testimony of Uanreroro and her mother appeared inconsistent with regard to her marital status; (2) Department of State's FGM papers conflicted with her testimony concerning the practice in her home state; (3) Department of State's country report indicated laws banning

FGM; (4) the record was ambiguous as to Uanreroro's place of birth; and (5) Uanreroro knowingly made false statements to the immigration inspector upon her arrival in the United States. *See* IJ Dec. at 3–9.

Uanreroro sought review of this decision by the Board of Immigration Appeals (BIA), which affirmed the IJ decision in a one-page order reiterating only the first two reasons listed above (inconsistency concerning her marital status and conflict with the Department of State papers regarding FGM practices). *See* BIA Dec., Mar. 19, 2004, at 1.

### III. Discussion

On appeal to this court, Uanreroro alleges the IJ's findings were not based upon substantial evidence and that the BIA erred by relying on them. Below is an assessment of the agency adjudication of her claims for asylum and withholding of removal.

### A. Statutory and Regulatory Framework

"To obtain asylum, petitioners must prove that they are refugees as defined in 8 U.S.C. § 1101(a)(42)(A), and then persuade the Attorney General to exercise his discretion to grant relief under 8 U.S.C. § 1158(b)." *Batalova v. Ashcroft*, 355 F.3d 1246, 1254 (10th Cir. 2004). Applicants are refugees if they can demonstrate they are unwilling or unable to return to their country because of past persecution or a "well-founded fear" of future persecution, which is "on account

of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.SC. § 1101(a)(42)(A).

Uanreroro attempts to show she is a refugee by presenting evidence that (1) she subjectively fears persecution, (2) the persecution is on the basis of a protected status, and (3) her fear is objectively reasonable.  As to the first two elements, Uanreroro alleges fear of forced FGM as well as severe punishment (or even death) for attempting to evade the mutilation ritual.  In *Niang v. Gonzales*, 422 F.3d 1187 (10th Cir. 2005), we held that FGM qualifies as persecution based upon membership in a particular social group: "a female member of a tribe that subject[s] its females to FGM establish[es] . . . persecution on account of being a member of a social group defined by her gender and tribal membership." *Id.* at 1201.

To meet the third element, however, Uanreroro must demonstrate a reasonable possibility of being persecuted.  *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987).  "[S]o long as an objective situation is established by the evidence, it need not be shown that the situation will probably result in persecution, but it is enough that persecution is a reasonable possibility." *Id.* at 440 (quoting *INS v. Stevic*, 467 U.S. 407, 424–25 (1984)) (rejecting a "preponderance of the evidence" standard for establishing persecution in asylum

cases and acknowledging the statute is broad enough to countenance relief for a petitioner who demonstrates only a 10% chance of being persecuted).

Applicants who cannot establish a well-founded fear under asylum standards will necessarily fail to meet the higher burden of proof required for withholding of removal under the INA or Convention Against Torture. To obtain relief under the INA, an applicant must "establish a clear probability of persecution" on account of one of the statutorily protected grounds listed above. 8 U.S.C. § 1231(b)(3); *Elzour v. Ashcroft*, 378 F.3d 1143, 1149 (10th Cir. 2004). A "clear probability" means the persecution is more likely than not to occur upon return. *Elzour*, 378 F.3d at 1149. To obtain relief under the Convention Against Torture, aliens must prove it is more likely than not they will be tortured upon return, although the torture need not be on account of a protected status. 8 C.F.R. § 208.16–18; *Elzour*, 378 F.3d at 1150.

## B. Scope of Appellate Jurisdiction

The threshold question in this case is whether we review (1) the BIA's affirmance, (2) the IJ's original analysis, or (3) both agency decisions. *See Cruz-Funez v. Gonzales*, 406 F.3d 1187, 1190 (10th Cir. 2005). We have general jurisdiction to review only a "final order of removal," 8 U.S.C. § 1252(a)(1), and there is no "final order" until the BIA acts. *Cruz-Funez*, 406 F.3d at 1190.

However, this does not mean our scope of review is limited to the BIA order itself.

Our scope of review depends in large part upon the process employed by the BIA below. The Attorney General has recently expanded the options available to the BIA when reviewing an IJ decision. *See Tsegay v. Ashcroft*, 386 F.3d 1347, 1351–52 (10th Cir. 2004) (describing regulatory changes). Originally, all appeals to the BIA required a three-member panel to review the decision and issue an opinion. *Id.* In 1999, the Department of Justice declared that the number of appeals to the BIA "exceeded the Board's capacity to give meaningful, three-Member consideration to each appeal, and to issue a written decision in every case." 64 Fed. Reg. 56,135, 56,138 (Oct. 18, 1999). Consequently, the DOJ revised the regulations to include a "summary affirmance" option for certain cases. *Id.* In 2002, the Attorney General again authorized revisions to the regulations, creating a third method of BIA review. *See* 67 Fed. Reg. 54,878, 54,885 (Aug. 26, 2002) (to be codified at 8 C.F.R. pt. 3). These revisions were made expressly applicable to pending and subsequent cases and therefore govern Uanreroro's appeal. 67 Fed. Reg. at 54,878.

Because the different methods of BIA decision-making have different implications for the scope of our review, we begin by explaining each of the methods currently available to the BIA.

**1. Full Panel Review and Opinion – Section 1003.1(e)(6)**

For a particularly difficult or important case (as defined in the regulations), the BIA continues to conduct a three-member panel review, which requires the issuance of a full explanatory opinion. 8 C.F.R. § 1003.1(e)(6); 67 Fed. Reg. at 54,886 n.6. When using this method, the BIA opinion completely supercedes the IJ decision for purposes of our review.

**2. Single-Member Affirmance without Opinion – Section 1003.1(e)(4)**

For a more routine appeal, the regulations authorize a single BIA member to adopt the IJ decision and issue an affirmance without opinion. This does not necessarily imply approval of all the reasoning contained in the IJ opinion, but it signifies that any potential errors are deemed harmless or nonmaterial by the Board member. 8 C.F.R. § 1003.1(e)(4)(i)–(ii). It is important to note that a BIA member who chooses to apply this procedure may not give reasons for its decision. *Tsegay*, 386 F.3d at 1352; *see Hang Kannha Yuk v. Ashcroft*, 355 F.3d 1222, 1230 (10th Cir. 2004). Instead, the Board member is limited to a summary affirmance, using the following language:

> The Board affirms, without opinion, the result of the decision below.
> The decision below is, therefore, the final agency determination.
> See 8 C.F.R. § 1003.1(e)(4).

8 C.F.R. § 1003.1(e)(4)(ii). Clearly, where the IJ reasoning is faulty, the BIA risks reversal on appeal if it chooses not to supplement or alter the reasoning

-11-

below. Thus, there is little incentive for the BIA to affirm without opinion unless it agrees with the IJ's reasoning. *See Hang Kannha Yuk*, 355 F.3d at 1230. By using this method, the BIA action renders the IJ decision the final substantive order for our review. *Tsegay*, 386 F.3d at 1353.

### 3. Single-Member Brief Order – Section 1003.1(e)(5)

A middle ground exists between the full opinion and summary affirmance options. "If the case is more significant than an (e)(4) [affirmance without opinion] case and less significant than an (e)(6) [full panel review] case, the single BIA member will decide the merits of the appeal by himself and issue 'a brief order, affirming, modifying or remanding' under 1003.1(e)(5)." *Cruz-Funez*, 406 F.3d at 1190 (internal citations omitted). It is clear that the BIA used this third procedure in Uanreroro's case, because her petition was not reviewed by a panel, nor did it include the mandatory language necessary for an affirmance without opinion.

Our prior cases have not yet fully explained our review process where the BIA employs the (e)(5) brief order method. We have held, though, that the (e)(5) brief order, unlike the (e)(4) affirmance without opinion, produces an independent BIA decision that constitutes the final order of removal under 8 U.S.C. § 1252(a). *Schroeck v. Gonzales*, 429 F.3d 947, 951 (10th Cir. 2005). Accordingly, in deference to the agency's own procedures, we will not affirm on grounds raised in

the IJ decision unless they are relied upon by the BIA in its affirmance. *Id; see SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *see also Elzour*, 378 F.3d at 1150; *Mickeviciute v. INS*, 327 F.3d 1159, 1162–63 (10th Cir. 2003).

However, when seeking to understand the grounds provided by the BIA, we are not precluded from consulting the IJ's more complete explanation of those same grounds. *See* 67 Fed. Reg. at 54,886 n.6. This is especially appropriate where the BIA incorporates by reference the IJ's rationale or repeats a condensed version of its reasons while also relying on the IJ's more complete discussion. We also look to the IJ's decision in these (e)(5) cases where the BIA reasoning is difficult to discern and the IJ's analysis is all that can give substance to the BIA's reasoning in its order of affirmance. *See, e.g., Cruz-Funez*, 406 F.3d at 1190–91. As long as the BIA decision contains a discernible substantive discussion, however, our review extends no further, unless it explicitly incorporates or references an expanded version of the same reasoning below.

## C. Standard of Review

Although always deferential to agency fact-finding, we must ensure that BIA conclusions are sufficiently supported by the available evidence. "[A]dministrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). We look to the record for "substantial evidence" supporting the

agency's decision: "[O]ur duty is to guarantee that factual determinations are supported by reasonable, substantial and probative evidence considering the record as a whole." *Elzour*, 378 F.3d at 1150. Thus, where the BIA determines a petitioner is not eligible for relief, we review the decision to determine whether the record on the whole provides substantial support for that determination. *Vatulev v. Ashcroft*, 354 F.3d 1207, 1208 (10th Cir. 2003).

Credibility determinations are factual findings also subject to the substantial evidence test. *Elzour*, 378 F.3d at 1150. Where the BIA's decision relies upon an IJ's initial findings, we must ensure that such determinations are "substantially reasonable." *Woldemeskel v. INS*, 257 F.3d 1185, 1189, 1192 (10th Cir. 2001). And "[b]ecause an alien's testimony alone may support an application for withholding of removal or asylum, 8 C.F.R. § 208.13(a), the IJ must give specific, cogent reasons for disbelieving it." *Sviridov v. Ashcroft*, 358 F.3d 722, 727 (10th Cir. 2004) (internal citations and quotations omitted). "An IJ's finding that an applicant's testimony is implausible may not be based upon speculation, conjecture, or unsupported personal opinion. . . . Rather, it must be supported by substantial evidence in the record." *Chaib v. Ashcroft*, 397 F.3d 1273, 1278 (10th Cir. 2005) (internal citations and quotations omitted).

In sum, although an applicant's testimony may be sufficient, without corroboration, to meet the burden of proof on any of the forms of relief, the

-14-

applicant's testimony must also be found "credible" and "persuasive," and refer to "specific facts sufficient to demonstrate that the applicant is a refugee." 8 U.S.C. § 1158(b)(1)(B)(ii). The trier of fact may also weigh the testimony along with other evidence of record. The credibility determination must be made based on the "totality of the circumstances" and "all relevant factors." § 1158(b)(1)(B)(iii).

**D. Application**

In this case, the IJ determined Uanreroro had not presented credible claims and provided five reasons for its conclusion: (1) the testimony of Uanreroro and her mother appeared inconsistent with regard to her marital status, which undermined her claim that she feared FGM upon her impending marriage; (2) the Department of State's FGM papers conflicted with her testimony concerning the timing of the practice in her home state, which cast doubt on her claim of persecution based on social group membership; (3) the Department of State's country report indicated Nigerian laws now banned FGM, which lowered the objective likelihood she would be subjected to the practice; (4) the record was ambiguous concerning Uanreroro's place of birth, which was also relevant to her objective risk of FGM; and (5) Uanreroro knowingly made false statements to the immigration inspector upon her arrival in the United States, which bore on her general credibility as a witness. *See* IJ Dec. at 3–9.

The BIA affirmed the IJ decision in a two-paragraph order.  The order restated the first reason provided by the IJ—discrepancy between the testimony of Uanreroro and her mother regarding her marital status—and reasoned that, because the discrepancy was substantial and went to the heart of her claim, Uanreroro did not present a credible claim for relief.  The order also cited the second reason given by the IJ—conflicts between Uanreroro's testimony and the Department of State's FGM papers concerning the practices of FGM in her home state—and determined that the information in the report specifically rebutted Uanreroro's claim.  Without mentioning the IJ's remaining reasons, the BIA concluded that Uanreroro had failed to meet her burden of proof and, accordingly, dismissed her appeal.

While the BIA's order expressly adopted two of the grounds provided by the IJ, it suggested (without explicitly incorporating additional reasons) that the totality of the evidence supported the credibility determination.  Ordinarily, where the BIA chooses the (e)(5) brief order method, it is preferable for the BIA to tell us what reasons it deems dispositive, or plainly incorporate the IJ's order by reference.  The BIA need not recount the entire discussion below.  But, if it intends to incorporate one or more of the reasons already provided to support its conclusion, the BIA must make clear it is doing so.  Absent any such language, we must assume that the BIA intended only the reasons expressly stated in its

-16-

decision. We are not at liberty to search for grounds to affirm that were not relied upon by the agency. *Chenery*, 332 U.S. at 196–97; *see Elzour*, 378 F.3d at 1150; *Mickeviciute*, 327 F.3d at 1162–63.

In this case, the outcome would be the same whether we read the BIA decision narrowly or broadly. Thus, after evaluating the reasons given by the IJ, those explicitly referred to by the BIA and those implicitly included from the IJ's order, we find the agency decision is not supported by substantial evidence.

### 1. Testimony Regarding Uanreroro's Marital Status

The BIA affirmed the IJ's finding that Uanreroro's testimony concerning her marital status conflicted with her mother's testimony and concluded that this undermined her claim of FGM upon her impending arranged marriage. First, the IJ pointed to what it perceived to be differences between Uanreroro's testimony and her mother's affidavit. Specifically, Uanreroro testified that she was scheduled to undergo FGM in conjunction with a forced marriage to the chief priest of her village but that she had managed to escape beforehand. Her mother's affidavit, however, stated that Uanreroro "was forcibly married," R. at 289, suggesting the marriage had already taken place.

When the IJ questioned Uanreroro about her mother's verb tense, she replied that her mother had trouble with English. This explanation is amply

supported by the record, as demonstrated in the following excerpts from the documents submitted by Uanreroro's mother:

(1) In a letter to Uanreroro, dated August 10, 2002, her mother wrote,

> My life has been so disorganised [sic] since your people *can't see you to force you into the marriage* with the Chief Esebeme.

R. at 320.

(2) Then, in a letter to the IJ, dated September 30, 2002, her mother wrote,

> [M]y daughter Omon A. Uanreroro left Uzebba in Owan-West local government area of Edo State in Sept. 2000 because of the female circumcision and arranged marriage she was forced into . . . . *Omon has being* [sic] *forcefully married once* to the chief priest of Uzebba and I refused to accepted [sic] that arrangement. For this or these reasons I was forced to borrow money . . . to send her to Europe.

R. at 325–26.

(3) Finally, in a sworn affidavit, executed November 11, 2002, her mother attested,

> Omon Adaeze Uanreroro *was forcibly married* to one Chief Priest called Elakhe in our village, Uzebba . . . . [A]s a result of this forcible marriage, [she] was due for female circumcision according to the tradition. . . . [A]s a result of this female circumcision which I am opposed to, *I have* [sic] *to borrow money . . . with which I sent Omon out of Nigeria* to save her life. . . . *I have* [sic] *to do what I did* to save my daughter's life.

R. at 289 (emphasis added).

Not only do these portions of the record support Uanreroro's explanation but they reveal several gaps in the IJ's decision. A cursory review reveals at least four obvious errors of verb tense (marked, along with spelling errors, with "sic"

-18-

above), which plainly show her mother's difficulty with the English language. In addition, Uanreroro's mother changes tenses with regard to the marriage itself (emphasized above). In the first example, she refers to Uanreroro's unconsummated future marriage, while the third example seems to describe a past marriage, and the second example is ambiguous, because the verb tense "has being" is entirely incorrect.

As noted above, our duty is to ensure that agency determinations are "substantially reasonable." *Woldemeskel*, 257 F.3d at 1192. We can see no logical explanation for the IJ's decision to first declare all three documents unreliable, then to rely on one of them (the third example above) while ignoring the other two (the first and second examples above). The IJ provided no explanation for this inconsistent use of supporting documents. Focusing on one statement in one document, which seemed to contradict the petitioner's testimony, while simultaneously failing to address related portions of the same documents, which supported her testimony, does not demonstrate a "reasonable, substantial and probative" review of the evidence. *Elzour*, 378 F.3d at 1150. By repeating the IJ's reasoning, the BIA also repeated the IJ's error. *See* BIA Dec. at 1.

Even if the IJ and BIA had considered every document, no reasonable basis exists for concluding that, of the three tenses used by Uanreroro's mother, the past tense was the one she intended. At most, the record suggests ambiguity in

-19-

the timing of Uanreroro's marriage, but even that does not support the conclusion that her mother's testimony "specifically rebuts [Uanreroro's] asylum claim." *Id.* To the contrary, Uanreroro claimed she was originally scheduled to be circumcised along with other members of her age group in order to be eligible for marriage generally but that, although she escaped that ritual ceremony, she was nonetheless required to undergo the procedure to prepare for the subsequently arranged marriage with the chief priest. Uanreroro's mother, despite her grammatical shortcomings, clearly supports this account—that FGM and marriage were inseparable in their culture and that Uanreroro fled her homeland to escape the inevitable FGM accompanying a marriage. [2]

_____

[2] As further support for this point, the IJ (but not the BIA) pointed to the hyphenated name, Uanreroro-Irenoa, printed on her passport and mused, "It would seem that perhaps [Uanreroro] was married and the second last name, the hyphenated last name[,] was, in fact, her married name." IJ Dec. at 6. As we have previously emphasized, "An IJ's finding that an applicant's testimony is implausible may not be based upon speculation, conjecture, or unsupported personal opinion. . . . Rather, it must be supported by substantial evidence *in the record*." *Chaib*, 397 F.3d at 1278 (quoting *Elzour*, 378 F.3d at 1150) (internal quotations omitted) (emphasis added). Uanreroro explained that the name "Irenoa," which she also printed on her asylum application, was her great, great grandfather's name, and there is no support in the record for the IJ's contrary assumptions that Nigerian traditions are more similar to ours in this area. Moreover, even if, as the IJ believed, her mother's testimony suggested she was already married to the chief priest, her mother referred to the priest as "Chief Esebeme" and "the Chief Priest called Elakhe." R. at 320, 289. While it is unclear which was his last name, neither supports the conclusion that she was married to someone named "Irenoa." While the IJ is entitled to resolve reasonable disputes contained in the record, it may not rely upon independent

(continued...)

-20-

## 2. Department of State's FGM Papers

The BIA also agreed with the IJ that the Department of State's FGM papers contradicted Uanreroro's testimony concerning the practice in her home state. The BIA's reasoning referred exclusively to a Department of State publication on female genital mutilation (FGM papers). According to this document, the practice of FGM varies greatly in Nigeria. It can take place any time during a female's life or, in extreme cases, even after she has died. FGM is performed before marriage in some areas and before the first child is born in other areas. For example, "among the Edo in midwestern Nigeria" it takes place "only before the first child is born." R. at 255. The BIA pointed to this example and, noting that Uanreroro had testified to being from Edo State, concluded that she had lied when she claimed her people practiced FGM before marriage.

The BIA's reasoning is flawed for two reasons: it is incomplete, and it relies on stale data. Uanreroro claims to be from *Edo State*, a geographical area that contains only a subset of the Edo people. Edo State is located in the *southern* part of Nigeria. Thus, given that the cited example in the FGM papers describes only the practices of the *Edo people* of *midwestern* Nigeria, neither the IJ nor the

---

[2](...continued)
assumptions not supported by the record. Therefore, this does not assist the agency's reasoning concerning her marital status. *See Wiransane v. Ashcroft*, 366 F.3d 889, 898 (10th Cir. 2004).

-21-

BIA explained how this example specifically rebuts Uanreroro's testimony. Because the agency is required to provide "specific, cogent reasons" to support its adverse credibility determinations, this reason alone does not suffice. *Niang*, 422 F.3d at 1201 (quoting *Wiransane v. Ashcroft*, 366 F.3d 889, 897–98 (internal quotations omitted).

Even if we could somehow agree that a statement about the practice of FGM among the Edo people of midwestern Nigeria directly conflicted with Uanreroro's testimony about the different practices in Edo State in southern Nigeria, this line of reasoning is potentially troubling because it is based upon a superceded version of the Department of State's FGM papers. The BIA (and IJ) relied upon the version published in 1997, even though a 2001 version was made available a year and a half before Uanreroro's hearing. The BIA itself has indicated that, in immigration proceedings, it expects the government's counsel to introduce into evidence "current country reports, advisory opinions, or other information readily available from the Resource Information Center." *See Matter of S-M-J*, 21 I&N Dec. 722, 726–27 (BIA 1997). At least one circuit has chosen to remand an appeal for further proceedings based on the BIA's reliance on outdated information. *See Yang v. McElroy*, 277 F.3d 158, 163 (2d Cir. 2002) (remanding based on agency's failure to consult most recent country report and holding INS had "burden of production" based on its "greater access" to the

information).  *But see Meghani v. INS*, 236 F.3d 843, 848 (7th Cir. 2001) (declining to remand for agency's failure to consider most recent country report because it found no cases requiring the BIA to *sua sponte* take administrative notice of the most recent country report).

In this case, we believe a remand is necessary so that the BIA may reconsider its reasoning as well as its source.  The insufficient explanation, coupled with the reliance on outdated information and the high stakes involved, give us sufficient reason to doubt the agency's determination on this basis.  However, given that the current version of the Department of State FGM papers is materially different from the outdated version, we will not, as a reviewing court, step into the agency's role and engage in our own fact-finding.  This information is most appropriately reviewed and applied in the first instance by the agency with the appropriate expertise in that area.  *INS v. Orlando Ventura*, 537 U.S. 12, 16–17 (2002).

### 3.  Department of State's Country Report

In addition to the above-mentioned FGM papers, the IJ also looked to the Department of State's report on Nigeria generally (country report).  The IJ noted that, according to the county report, Edo State had banned the practice of FGM.  Given that Uanreroro claimed to be from Uzebba village in Edo State, the IJ

concluded that Uanreroro's objective risk of FGM was relatively low. IJ Dec. at 7–8; BIA Dec. at 1 .

However, a closer reading of the report indicates that, although Edo State had banned FGM, the law may not be enforced:

> In Edo State, the punishment [for FGM] is a $10 fine and 6 months imprisonment. . . . [O]nce a state legislature criminalizes FGM, NGOs have found that they must convince the LGA [local government area] that state laws are applicable in their districts.

R. at 276. Uanreroro's testimony is consistent with the above accounts. She testified that she was unaware of any law banning FGM in her state but that such a law would not affect the chief priests who controlled the local FGM practices.

The country report also indicates that approximately 50–60 percent of Nigerian females are subjected to FGM but emphasizes that, among some of the country's southern ethnic groups, the rate could be as high as 100 percent. Uanreroro testified (and the country map confirms) that Edo State is located in the southern part of Nigeria, and she testified that, among her people, FGM was practiced on almost every female. Therefore, we see no inconsistencies between the Department of State report and Uanreroro's account.

Given that a petitioner's testimony alone may suffice to establish her claims for relief, 8 U.S.C. § 1158(b)(1)(B)(ii) , the reports need not contain detailed information corroborating Uanreroro's account of the practice within her ethnic group. We need only consider whether the information about laws banning FGM

provides substantial evidence to directly rebut or undermine her claims. Specifically, as to her claim that she is a refugee and thus eligible for asylum, we must determine whether the report rebuts her claim that she has at least a "reasonable possibility" of being subjected to FGM. *Cardoza-Fonseca*, 480 U.S. at 440. Secondly, as to her claim that she is entitled to withholding of removal under the INA and Convention Against Torture, we must decide whether the Department of State report contradicts her claim that she is more likely than not to be subjected to FGM. *See Elzour*, 378 F.3d at 1149–50.

We conclude that the information proffered by the IJ does not provide substantial evidence to support its determination. Although the Department of State indicates that Edo State formally banned the practice of FGM, the Department of State also acknowledges that it does not consistently enforce the law. Specifically, the indication that certain southern ethnic groups practice FGM at a rate far higher than the state and national average is consistent with Uanreroro's claims that the people of her village circumcise nearly every female. Thus, absent any information about her specific village or ethnic group, the Department of State's description of Edo State's laws does not constitute substantial evidence for denying her claims.

### 4. Information Concerning Uanreroro's Birth Place

According to the IJ, the record's ambiguity about Uanreroro's place of birth bore directly upon her claimed fear of persecution. When asked about her birth place, Uanreroro replied that, to the best of her knowledge, she had lived in Uzebba village in Edo State from birth and that all of her childhood memories were from Uzebba. She explained, however, that the man who had helped her obtain a passport in Lagos had listed the city of Lagos as her birth place and that she had written that on her subsequent asylum application in order to be consistent. The IJ found this ambiguity suggestive. Additionally, the IJ noted that Uanreroro's mother provided an affidavit executed in Lagos. Thus, the IJ concluded, "This is more evidence that [Uanreroro] has more of a connection with the capital of Nigeria in Lagos than she is inclined to admit. Of course, if [Uanreroro] actually lived in Lagos, then the probability of the FGM that she claims would be substantially reduced." IJ Dec. at 7.

We will uphold an adverse credibility determination if the IJ provides "specific, cogent reasons" but not if the rationale is based upon "speculation or conjecture." *Niang*, 422 F.3d at 1201 (quoting *Wiransane*, 366 F.3d at 897–98 (internal quotations omitted). Here, it was reasonable for the IJ to resolve the dispute about Uanreroro's birth place in favor of Lagos, but this does not by itself destroy Uanreroro's credibility as a general matter, because she admitted to uncertainty about the issue. Nor is the relationship between her potential city of

-26-

birth and her present claims for FGM immediately clear. As an initial matter, we consider it unreasonable to infer that her mother's execution of a document in Lagos necessarily establishes that Uanreroro has "a connection with the capital of Nigeria in Lagos" that is sufficient to undermine her asylum claims.

The remaining links in the IJ's chain of logic represent unsubstantiated assumptions held together by an incorrect statement of fact. First, the IJ assumes that if Lagos was Uanreroro's birth place, it was also her most recent residence. There is no support in the record for such an assumption. Next, the IJ holds out Lagos as the capital of Nigeria and surmises that the chances of FGM are thus "substantially reduced" there. In fact, Lagos is not the capital of Nigeria; Abuja became the capital in 1991. Even if this mistaken factual premise were true, however, it does not naturally follow that Lagos would be less prone to FGM, nor does the record provide a basis for this assumption. This entire strand of reasoning is unsupported by the record and therefore not sufficient to constitute substantial evidence to support its conclusion. *See Chaib*, 397 F.3d at 1278.

### 5. Uanreroro's Statements to the Immigration Inspector

The IJ finally noted that, because Uanreroro knowingly made false statements to the immigration inspector upon her attempted entry into the United States, she demonstrated a general lack of credibility as a witness. Specifically, Uanreroro stated that the passport she carried was hers and that her traveling

companion was her husband.  Neither of these statements was true.  In addition, after the passport fraud was discovered, Uanreroro told the immigration inspector (under oath) that she lived in London for six months where she met the woman whose passport she now carried.  In her asylum proceedings before the IJ, however, Uanreroro admitted that she had never even been to London.

According to the IJ, this reason was sufficient by itself to destroy the credibility of her subsequent asylum claims.  The IJ rejected the explanation that she lied out of fear of being returned to Nigeria or fear of her traveling companion who threatened to kill her if she implicated him in the scheme.  The IJ concluded, "[I]t's clear that [Uanreroro] is not a reliable witness, even when she is under oath.  Her testimony cannot be considered by itself to be sufficient to meet her burden of proof."  IJ Dec. at 5–6.  Thus, given the IJ's prior rejection of her corroborating evidence, this adverse credibility determination formed a conclusive basis for denying Uanreroro's claims.

When making a credibility determination, the IJ is required to consider "the totality of the circumstances, and *all relevant factors*."  8 U.S.C. § 1158(b)(1)(B)(iii) (emphasis added).  Here, by contrast, the IJ found this reason dispositive.  Thus, the IJ disregarded Uanreroro's allegations of a well-founded fear of FGM based solely on statements she made *before* filing for asylum and without regard to any of the information that pertained to her substantive claims.

-28-

It is readily apparent that lying to gain entry to the United States may be entirely consistent with fleeing persecution. Indeed, competing views exist on the relevance of such statements. The Ninth Circuit has held, as a matter of law, where an alien's claims are based upon fear of persecution, lies told in order to gain admission to the United States cannot serve as a basis for an adverse credibility finding. *Akinmade v. INS*, 196 F.3d 951, 955 (9th Cir. 1999).

We decline to adopt the Ninth Circuit's *per se* rule, however, as such lies could be consistent with any number of motives for entry. Therefore, these facts are appropriate to consider as part of the "totality of the circumstances" surrounding an asylum applicant's claim. Nonetheless, we still reject the IJ's position, which errs at the opposite extreme, causing an alien who lies upon entry to thereby forfeit her right to present a credible case for asylum. Consideration of "all relevant factors" cannot mean ignoring the claim itself, including the applicant's testimony about her reasons for fearing persecution and the objective circumstances in the applicant's home country. Therefore, while it was appropriate for the IJ to consider Uanreroro's statements upon entry as a *factor* in its credibility determination, it does not alone rise to the level of "substantial evidence" to support an adverse decision on her claims for relief. Given that this reason is insufficient alone to support the agency decision, and given that we have

-29-

already rejected the other reasons provided, we are unable to affirm the decision below.

## IV. Conclusion

For the reasons stated above, we hold that the agency decision to deny Uanreroro relief was not supported by substantial evidence. The reasons presented by the IJ and repeated in part by the BIA neither individually nor collectively constitute substantial evidence to support its final determination. Accordingly, we REVERSE the BIA's final order and REMAND for further proceedings.