FILED
United States Court of Appeals
Tenth Circuit

September 17, 2019

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JEYAVATHANAN
JEYABALASINGGAM,

    Petitioner,

v.

WILLIAM P. BARR, United States
Attorney General,

    Respondent.

No. 19-9511
(Petition for Review)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HOLMES**, **O'BRIEN**, and **MATHESON**, Circuit Judges.
_____

Jeyavathanan Jeyabalasingam is a native and citizen of Sri Lanka.[1]  An

immigration judge (IJ) denied his requests for asylum, withholding of removal, and

protection under the Convention Against Torture (CAT).  The Board of Immigration

_____

[*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore
submitted without oral argument.  This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel.  It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

[1] We spell petitioner's last name "Jeyabalasingam" because that is how he
spelled his name on his asylum application and how it was spelled in the initial
immigration proceedings.  We note, however, that the order on review spells his last
name "Jeyabalasinggam."

Appeals (BIA) upheld the IJ's decision. Mr. Jeyabalasingam now seeks review of the BIA's decision. Exercising jurisdiction under 8 U.S.C. § 1252(a), we deny the petition for review.

## I. BACKGROUND

Mr. Jeyabalasingam's ethnicity and language is Tamil. The IJ's decision provided the following background information:

> Governmental apparatuses in Sri Lanka have been controlled for decades by the Sinhalese ethnic majority. Tamil are the largest ethnic and linguistic minority in Sri Lanka, representing about 11 percent of the population. Tamil is an official and national language in Sri Lanka.
>
> From 1983 until 2002 Tamil separatists fought the government. The main military arm of the separatists was the Liberation Tigers of Tamil Eelam (LTTE), which the U.S. Department of State designated a foreign terrorist organization (FTO) in 1997. The civil war formally ended with a cease fire in 2002, but the cease fire was abrogated by both parties in 2006. The Sri Lankan government withdrew from the cease fire in 2008 and defeated the separatists in 2009.
>
> The Sri Lankan government engages in widespread mistreatment of the Tamil minority (including torture). Tamils with actual or perceived links to the LTTE are particularly vulnerable to mistreatment.

Admin. R. at 48.

The IJ summarized Mr. Jeyabalasingam's testimony about his family background and his childhood in Sri Lanka:

> [Petitioner's] father was killed in 1994 by navy shelling as he was plying his trade as a fisherman. [Petitioner] was born one month after his father was killed.

2

> [Petitioner's] family left Nagarkovil because the Sri Lankan army was bombing the area. They moved to Vanni.
>
> [Petitioner's] maternal uncle, who was a member of the LTTE, lived near [petitioner] and helped his sister— [petitioner's mother]—raise her family. The uncle was killed in May 2000 by a Sri Lankan warplane.
>
> [Petitioner's] older brother followed his father's trade and worked as a fisherman. He disappeared in February 2007 when he was fishing. His fate and whereabouts have never been determined. [Petitioner] claims that the Sri Lankan navy had a history of abducting Tamils; [petitioner] suspects, but has no proof, that the navy abducted his brother.
>
> In 2009, the Sri Lankan army captured Vanni and many ethnic Sihhalese moved into Vanni. [Petitioner's] family was required to move to a refugee camp in Vavuniya. Life was difficult in the camp. Sinhalese authorities would subject [petitioner's] mother to frequent questioning because her brother ([petitioner's] uncle) had been a member of LTTE. The authorities claimed, erroneously, that [petitioner's] older brother had also been a member of LTTE and claimed to disbelieve [petitioner's] mother's denials. She was asked to sign a statement that her older son had been a member of LTTE.

*Id*. at 48-49.

Mr. Jeyabalasingam testified at the hearing that he and his family left the refugee camp in 2010. In 2015, his work included taking fish to the market to sell. One day, a Sinhalese gang stole his fish. He did not report the theft to the police because he did not believe they would help a Tamil. He stopped going to the market to sell fish because his mother was afraid for him.

In 2017, Mr. Jeyabalasingam and his family participated in a protest demonstration asking the government to return land to the Tamil people that the

3

government had taken from them. A few days later, members of the Sri Lankan army came to his home when they were canvassing the neighborhood after the protest. They ordered him to go with them for questioning. He agreed at first, but when they told him to get into their vehicle, he resisted. One of the soldiers put a gun against Mr. Jeyabalasingam's head to force him into the vehicle.

Once everyone was inside the vehicle, the soldiers told Mr. Jeyabalasingam that he should not participate in any other protests if he desired to live. They said they would release him for money. The soldiers took him back to his house. His mother gave them money, and his sister gave them a gold ring. Before they left, the Tamil who accompanied the soldiers to act as an interpreter told Mr. Jeyabalasingam that the army knew his uncle had been a member of LTTE and that he should leave Sri Lanka to be safe. Mr. Jeyabalasingam decided to leave Sri Lanka.

Mr. Jeyabalasingam entered the United States without a valid entry document. During immigration proceedings, he conceded he was removable as charged. He applied for asylum, withholding of removal, and protection under the CAT. The IJ denied relief, and the BIA upheld the IJ's decision. Mr. Jeyabalasingam filed a timely petition for review of the BIA's decision.

## II. **AGENCY DECISIONS**

To receive asylum, Mr. Jeyabalasingam needed to show he had suffered past persecution or that he would suffer future persecution on account of a protected ground—race, religion, nationality, membership in a particular social group, or political opinion. *See Rodas-Orellana v. Holder*, 780 F.3d 982, 986 (10th Cir. 2015).

4

For withholding of removal, he needed to meet a higher burden of proof than for asylum by "establish[ing] a clear probability of persecution on account of one of the statutorily protected grounds." *Uanreroro v. Gonzales*, 443 F.3d 1197, 1202 (10th Cir. 2006). For CAT relief, Mr. Jeyabalasingam had to prove it was more likely than not he would be tortured if he returned to Sri Lanka. *See id*.

The IJ concluded that Mr. Jeyabalasingam had not established past persecution because "[t]he two instances of direct harm [petitioner] testified to—the robbery at the hands of the Sinhalese gang and his brief detention by members of the Sinhalese army—do not rise to the level of persecution." Admin. R. at 51. The IJ further determined that Mr. Jeyabalasingam had not shown a well-founded fear of future persecution because the evidence was insufficient to show he would be persecuted based on his status as an ethnic Tamil, his political opinion, or his request for asylum.

Mr. Jeyabalasingam also argued he would suffer future persecution based on his membership in the particular social group (PSG) of ethnic Tamils who have a family member who was a member of the LTTE. The IJ concluded this proposed PSG was not cognizable because "[t]here is no evidence in the record that the Sri Lankan society recognizes the proposed PSG as socially distinct." *Id*. at 52.

The IJ then determined that, because Mr. Jeyabalasingam failed to establish his entitlement to asylum relief, "he necessarily failed to meet the higher evidentiary burden to establish eligibility for withholding." *Id*. at 53. As to his CAT claim, the IJ found there was no evidence Mr. Jeyabalasingam was tortured in the past and that

5

he "ha[d] failed to present evidence that there is a clear probability that he faces a future threat of torture." *Id*. at 54.

Mr. Jeyabalasingam appealed to the BIA. The BIA affirmed the IJ's conclusions that Mr. Jeyabalasingam had not established past persecution or a well-founded fear of future persecution based on any protected ground. It agreed with the IJ that Mr. Jeyabalasingam had failed to establish his membership in a cognizable PSG. The BIA also agreed that the record did not establish a basis for CAT relief.

### III. **DISCUSSION**

Mr. Jeyabalasingam challenges the BIA's decision upholding the IJ's denial of his asylum application. He argues the BIA erred in determining that he failed to establish (A) past persecution, (B) a well-founded fear of future persecution, or (C) a socially distinct PSG. Because we hold the BIA committed no legal error and that substantial evidence supported each of these determinations, we deny the petition.[2]

When a single member of the BIA affirms the IJ's decision in a brief order, *see* 8 C.F.R. § 1003.1(e)(5), the BIA's decision is the final order under review, *see Uanreroro*, 443 F.3d at 1204. "[W]hen seeking to understand the grounds provided by the BIA, we are not precluded from consulting the IJ's more complete explanation of those same grounds." *Id*. "We review the BIA's legal determinations

---

[2] Mr. Jeyabalasingam does not challenge the BIA's decision upholding the denial of his applications for withholding of removal or for CAT relief. He has therefore waived review of the denial of those claims for relief. *See Krastev v. INS*, 292 F.3d 1268, 1280 (10th Cir. 2002) ("Issues not raised on appeal are deemed to be waived.").

de novo, and its findings of fact under a substantial-evidence standard." *Niang v. Gonzales*, 422 F.3d 1187, 1196 (10th Cir. 2005). Under that standard "the BIA's findings of fact are conclusive unless the record demonstrates that any reasonable adjudicator would be compelled to conclude to the contrary." *Id.*

## A. *Past Persecution*

Mr. Jeyabalasingam contends the BIA erred because it (1) misconstrued this court's case law regarding the level of harm required to establish past persecution, and (2) "overlooked and misconstrued evidence pertaining to the harm suffered by Petitioner and failed to consider such harm cumulatively." Pet'r Br. at 16.

## 1. **Level of Harm**

In its discussion of Mr. Jeyabalasingam's past-persecution claim, the BIA reviewed the IJ's finding that the robbery by the Sinhalese gang and Mr. Jeyabalasingam's brief detention and extortion by members of the army did not rise to the necessary level of persecution. The BIA cited two cases in which this court upheld the agency's finding of no past persecution—*Tulengkey v. Gonzales*, 425 F.3d 1277, 1281 (10th Cir. 2005), and *Kapcia v. INS*, 944 F.2d 702, 704-05, 708 (10th Cir. 1991). *See* Admin. R. at 3. It noted that *Tulengkey* involved a robbery and, in *Kapcia*, the alien was detained on two separate occasions. *See id.* Comparing those cases with *Nazaraghaie v. INS*, 102 F.3d 460, 463-64 (10th Cir. 1996), the BIA noted that in *Nazaraghaie*, this court "suggest[ed] that [the] asylum applicant's severe beating and ten month imprisonment on account of his political opinion constituted persecution." Admin. R. at 3-4. It then stated, "Here, we have no

7

allegations of imprisonment or severe beatings. Rather, the [petitioner] suffered harassment and a brief detention on account of his family's ties and suspected ties to the LTTE and his ethnicity, and for the purposes of extortion." *Id*. at 4.

Mr. Jeyabalasingam argues that "[t]he BIA incorrectly implied that the *Nazaraghaie* decision establishes that imprisonment or severe beatings are required in order to establish past persecution." Pet'r Br. at 16-17. But the BIA did not make this implication; nor does *Nazaraghaie*.

The Immigration and Nationality Act does not define persecution, but we have explained that "a finding of persecution requires the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive and must entail more than just restrictions or threats to life and liberty." *Wiransane v. Ashcroft*, 366 F.3d 889, 893 (10th Cir. 2004) (internal quotation marks omitted). We seek guidance from cases that have addressed whether particular circumstances support a finding of past persecution. *See, e.g.*, *Xue v. Lynch*, 846 F.3d 1099, 1107 (10th Cir. 2017) (noting that "this court has previously determined that similar fact situations did not compel a finding of past persecution" and citing to cases from this court).

The BIA followed that approach here. It did not imply that past persecution could *only* be established by imprisonment or severe beatings. It determined that Mr. Jeyabalasingam's circumstances were more similar to cases in which this court had concluded that the evidence did not call for a finding of past persecution. He has not shown reversible error on this issue.

## 2. Failure to Consider Evidence

Although Mr. Jeyabalasingam concedes he "may not have experienced a single incident of harm that reaches the level of past persecution, the record shows that he suffered numerous instances of harm over an extended period of time in Sri Lanka." Pet'r Br. at 17. But this argument is based on alleged instances of past persecution that were not raised in his brief to the BIA.

As part of his cumulative-harm argument on appeal, he asserts that the BIA did not consider that:

- "Petitioner suffered when his family was forcibly relocated to a refugee camp in 2009";

- "he was severely restricted in his ability to work in order to support his family by the dangerous conditions imposed on the Tamil communities by the Sinhala military"; and

- "was also restricted from returning to his family's land, which had been seized and was never returned although the war between the Sinhala and the Tamil separatists ostensibly ended in about 2008."

*Id*. at 18. He therefore contends that "[t]he record shows that the harm experienced by Petitioner in Sri Lanka cumulatively rose to the level of past persecution." *Id*.

Mr. Jeyabalasingam's argument fails because he did not include those allegations in his brief to the BIA. *See* Admin. R. at 10. Because he did not administratively exhaust any claim of past persecution beyond the robbery or his encounter with the soldiers, we lack jurisdiction to consider those unexhausted claims. *See* 8 U.S.C. § 1252(d)(1) ("A court may review a final order of removal only if . . . the alien has exhausted all administrative remedies available to the alien

9

as of right[.]”); *Molina v. Holder*, 763 F.3d 1259, 1262 (10th Cir. 2014) (“In immigration cases, our jurisdiction extends only to issues that have been exhausted before the Board[.]”).

Mr. Jeyabalasingam also argues:

> The BIA[’s] decision does not acknowledge that during the “brief detention,” the Sinhala soldiers abused Petitioner physically and pointed a gun at his head, threatening to kill him. Petitioner specifically argued in his brief on appeal that it was error for the [IJ] to fail to address the imminent, realistic threat of death as part of the cumulative harm amounting to persecution of the Petitioner.

Pet’r Br. at 18.

Mr. Jeyabalasingam tries to argue cumulative harm from events that happened during a single incident, as opposed to the cumulative impact of multiple incidents. *See Ritonga v. Holder*, 633 F.3d 971, 975 (10th Cir. 2011) (“We do not look at each incident in isolation, but instead consider them collectively, because the cumulative effects of *multiple incidents* may constitute persecution.” (emphasis added)). The encounter with the soldiers was one incident in which the soldiers used a gun to force him into their vehicle and detained him briefly until he agreed to pay them for his release. Contrary to Mr. Jeyabalasingam’s assertion to this court, the soldiers did *not* physically harm him. *See* Admin. R. at 158-59 (“Now, when the army came to your home in March 2017, did they physically harm you? . . . . [Response:] [T]hey physically did not harm me.”). And forcing him into a vehicle at gun point, while threatening, is not the same as “threaten[ing] to kill him” or subjecting him to an “imminent, realistic threat of death.” The BIA said he was harassed, briefly detained, and was the victim of extortion.

10

Whether considered as one incident or more, the encounter with the soldiers does not compel the conclusion that Mr. Jeyabalasingam suffered past persecution.[3]

## B. *Future Persecution*

Before the BIA, Mr. Jeyabalasingam argued he had a well-founded fear of future persecution based on (1) his membership in a PSG, (2) a pattern and practice of persecution against ethnic Tamils, and (3) his political opinion.

A fear of future persecution "is objectively well-founded if (1) the petitioner may be singled out for persecution [on account of a protected ground] upon returning to [his] country of origin, or (2) there is a pattern or practice in [that] country of persecution of a group of persons similarly situated to the applicant" on account of a protected ground. *Ritonga,* 633 F.3d at 976 (internal quotation marks and ellipsis omitted).

## 1. Particular Social Group

Mr. Jeyabalasingam challenges the BIA's decision to affirm the IJ's conclusion that he did not establish his membership in a cognizable PSG. The BIA determined that Mr. Jeyabalasingam's "proposed [PSG] of 'ethnic Tamils who have a family member who was a member of the LTTE' lacks social distinction." Admin. R. at 4. Social distinction means that a group "must be *perceived* as a group by

---

[3] Mr. Jeyabalasingam does not raise any argument on appeal about the incident in which the Sinhalese criminals robbed him; he has therefore waived any challenge to that part of the BIA's determination regarding his claim for past persecution. *See Krastev*, 292 F.3d at 1280.

11

society." *Rodas-Orellana*, 780 F.3d at 991 (internal quotation marks omitted); *see also Matter of W-G-R-*, 26 I. & N. Dec. 208, 217 (BIA 2014) ("[S]ocial distinction exists where the relevant society perceives, considers, or recognizes the group as a distinct social group."), *vacated in part on other grounds by Reyes v. Lynch,* 842 F.3d 1125, 1129, 1143 (9th Cir. 2016). The BIA concluded that "[petitioner] did not establish that Sri Lankan society views ethnic Tamils who have a family member who was a member of the LTTE as a sufficiently separate or distinct group." Admin. R. at 4 (internal quotation marks omitted).

Mr. Jeyabalasingam argues the BIA's analysis was too conclusory. We disagree. The BIA appropriately considered the issue based on what he presented in his brief to the BIA. It asserted: "The members of the LTTE family are socially distinguishable. It is a small society and the society knows each and every one." *Id*. at 15. The brief also stated that when his family was in the refugee camp, someone told the army his uncle was in the LTTE.

The brief's assertions lacked evidentiary support. The fact that someone knew Mr. Jeyabalasingam's uncle was in the LTTE does not demonstrate that Sri Lankan society views ethnic Tamils who have an LTTE family member as a socially distinct group. Although Mr. Jeyabalasingam faults the BIA for not citing to evidence, he did not cite record evidence to support this argument in his brief to the BIA, *see id*. at 14-15, or in his brief to this court, *see* Pet'r Br. at 20-21. The BIA correctly noted that the applicant must demonstrate the existence of a cognizable PSG, *see*, *e.g.*, *Rodas-Orellana*, 780 F.3d at 991 (holding that petitioner failed to demonstrate his

12

proposed group was socially distinct).  We see no error in the BIA's conclusion that Mr. Jeyabalasingam failed to do so here.

## 2.  **Pattern or Practice of Persecution**

Mr. Jeyabalasingam also challenges the BIA's determination that he failed to show a pattern or practice of discrimination against ethnic Tamils to support his claim that he had a well-founded fear of future persecution.

The BIA said that the IJ "considered the long history of civil war, hostility and violence and mistreatment against the Tamil population by the majority Sinhalese and the government of Sri Lanka, including torture."  Admin. R. at 4.  But it further explained, "civil strife that 'causes substantial hardships for an ethnic minority, . . . does not automatically entitle all members of that minority to asylum.'"  *Id*. (quoting *Rasiah v. Holder*, 589 F.3d 1, 5 (1st. Cir. 2009)).  The BIA noted that "[t]he [petitioner] has not cited to a case where the Board or a court has found a pattern or practice of persecution against Tamils in Sri Lanka."  *Id*.  And it said that "[t]he [petitioner] has also not cited to any specific information in the record which establishes a pattern or practice of persecution and which the [IJ] failed to consider."  *Id*.  The BIA concluded that "the record does not establish that the treatment of Tamils, however unacceptable, is so widespread as to constitute a pattern or practice of persecution."  *Id*.

Mr. Jeyabalasingam contends that "[t]he BIA's reliance on *Rasiah* is inapposite" because the alien in *Rasiah* was found to be not credible and "depended solely on the pattern or practice theory for his claim, rather than using it to bolster his

13

credible testimony, as the Petitioner has done in the present case." Pet'r Br. at 24. But the BIA cited *Rasiah* for the general proposition that "civil strife that 'causes substantial hardships for an ethnic minority, . . . does not automatically entitle all members of that minority to asylum." Admin. R. at 4 (quoting *Rasiah*, 589 F.3d at 5). We see no legal error in the BIA's citation to *Rasiah*.[4]

We agree with the BIA that the record does not compel the conclusion that Mr. Jeyabalasingam established a well-founded fear of future persecution based on a pattern or practice of persecution against ethnic Tamils.

3. **Political Opinion**

Mr. Jeyabalasingam claimed he had a well-founded fear of future persecution on account of his political opinion. In his brief to the BIA, he argued that he would be "subject to persecution on account of political opinion, namely participation in the protest against the government." *Id*. at 12. He also argued that he would be subject to persecution as a "failed Tamil asylum seeker[]." *Id*. at 14.

---

[4] Mr. Jeyabalasingam attempts to make a new argument, quoting from *Rasiah* that "'[a]n applicant can often reinforce his claim of individualized harm or danger by showing that persecution of similarly situated persons has occurred.'" Pet'r Br. at 25 (quoting *Rasiah*, 589 F.3d at 4). Focusing on this language, he argues that "neither the BIA nor the [IJ] properly considered Petitioner's 'pattern or practice' argument as reinforcing his claim of individualized danger and past harm." *Id*. He asserts that "the BIA erred as a matter of law by considering the past harm that Petitioner suffered as an entirely separate claim from his pattern or practice claim." *Id*. But Mr. Jeyabalasingam did not raise this argument to the IJ or the BIA. Because he failed to exhaust his administrative remedies with respect to this argument, we lack jurisdiction to consider it. *See* 8 U.S.C. § 1252(d)(1); *Molina*, 763 F.3d at 1262.

14

The BIA determined that "[petitioner] has not presented evidence that his fear that he will be singled out for persecution on account of his political opinion is objectively reasonable." *Id*. at 4. Mr. Jeyabalasingam argues the IJ and BIA "failed to address credible testimony by the Petitioner that the S[i]nhala army had specifically targeted him because of his participation in a protest and that they told his mother they would kill him if they found him." Pet'r Br. at 28. But the IJ did address this claim, concluding that there was "insufficient evidence that Sri Lankan authorities will persecute [petitioner] . . . because he participated in a single public protest in 2017." Admin. R. at 52. We may rely on the IJ's more complete explanation when considering the BIA's decision on this issue. *See Uanreroro*, 443 F.3d at 1204.

As for his allegation about the army's threat to kill him, Mr. Jeyabalasingam did testify his mother told him that army members came to his house in January 2018 after he left the country and that the soldiers said if he was not there when they came back they would send a "shooting order for him . . . [saying] he should be shot and killed." Admin. R. at 139-40. But the IJ noted that Mr. Jeyabalasingam's mother had made statements about his detention in 2017 that he himself disputed (that he was tortured before he was released and that the soldiers tortured his mother too). *See id*. at 50 n.2. The IJ therefore stated that "[g]iven [p]etitioner's mother's tendency to exaggerate, the Court is skeptical that [the 2018] visit occurred and finds not credible the details of the visit she reported." *Id*. Mr. Jeyabalasingam did not challenge the IJ's decision that his mother was not credible. He has therefore not

15

cited to any credible testimony to support his claim that members of the Sri Lankan army would kill him if he returned to Sri Lanka. The credible evidence in the record does not compel the conclusion that Mr. Jeyabalasingam has an objectively reasonable fear of future persecution on account of his political opinion based on his participation in a single protest in 2017.

As for his claim that he would be subject to future persecution because he sought asylum in the United States, the BIA determined that the "record does not establish that [petitioner] will be persecuted on account of his political opinion based on his filing an asylum application in the United States. Asylum applications are confidential and the contents of such applications cannot be disclosed to third parties without the written consent of the applicant." *Id*. at 4. The BIA further determined that Mr. Jeyabalasingam "ha[d] not presented evidence that his fear that he will be singled out for persecution on account of his political opinion is objectively reasonable." *Id*. Mr. Jeyabalasingam contends the BIA erred in resolving this claim because "the fact that Petitioner fled Sri Lanka and tried to live in the United States before being deported would naturally draw the inference that he sought asylum." Pet'r Br. at 28. Although Sri Lankans may infer he had sought asylum based on his circumstances, he fails to cite to any record evidence to show that failed asylum seekers are subject to persecution in Sri Lanka. *Id*. Accordingly, he has not shown that a reasonable adjudicator would be compelled to conclude that he would be subject to persecution on account of his political opinion because he filed an asylum application in the United States.

16

Finally, Mr. Jeyabalasingam contends that the BIA "failed to consider the *past* harm [he] experienced . . . as evidence that he has an objectively reasonable fear of future persecution on account of an imputed political opinion." *Id*. at 27 (emphasis added). The alleged imputed political opinion is his uncle's membership in the LTTE. A finding of past persecution can give rise to a rebuttable presumption of future persecution. *See Karki v. Holder*, 715 F.3d 792, 801 (10th Cir. 2013); 8 C.F.R. § 1208.13(b)(1). But here, the BIA considered all of Mr. Jeyabalasingam's past harm, including his "harassment and a brief detention on account of his family's ties and suspected ties to the LTTE." Admin. R. at 4. The BIA affirmed the IJ's determination that he failed to establish past harm rising to the level of persecution. *Id*.

Because Mr. Jeyabalasingam did not establish past harm on the basis of his family's ties or suspected ties to the LTTE, there is no presumption of future persecution on that basis. *See* 8 C.F.R. 1208.13(b)(1). Mr. Jeyabalasingam has not pointed to any record evidence that would compel the conclusion that he has an objectively reasonable fear of future persecution on account of his family's ties to the LTTE or an imputed political opinion based on his family's ties to the LTTE. Although he states that "[t]he record and the credible testimony of the Petitioner establish that he was individually targeted in the past because of an imputed political opinion," Pet'r Br. at 29, he provides no record citations to support this conclusory assertion.

## IV. **CONCLUSION**

Substantial evidence supports the BIA's determination that

Mr. Jeyabalasingam failed to establish past persecution or a well-founded fear of

future persecution on any protected ground.  We further find no legal error in the

BIA's analysis.  We therefore deny the petition for review.

Entered for the Court


Scott M. Matheson, Jr.
Circuit Judge