**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 14 2005**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

NOUREDDINE CHAIB,

     Petitioner,

v.

JOHN ASHCROFT, Attorney General,

     Respondent.

No. 02-9582

---

**PETITION FOR REVIEW OF A**
**DECISION OF THE BOARD OF IMMIGRATION APPEALS**
**(No. A78-579-254)**

---

Laura L. Lichter of Lichter & Associates, P.C., Denver, Colorado, for Petitioner.

Arthur L. Rabin, Attorney, Office of Immigration Litigation (Peter D. Keisler, Assistant Attorney General, Civil Division; and Mark C. Walters, Assistant Director, with him on the brief), U.S. Department of Justice, Civil Division, Washington, D.C., for Respondent.

---

Before **SEYMOUR**, **McKAY**, and **MURPHY**, Circuit Judges.

---

**McKAY**, Circuit Judge.

---

    In this appeal, Noureddine Chaib ("Petitioner") challenges the Board of Immigration Appeals' ("BIA") affirmance without opinion of an Immigration Judge's ("IJ") denial of his application for asylum pursuant to 8 U.S.C. § 1158,

restriction on removal pursuant to 8 U.S.C. § 1231, and restriction on removal pursuant to the Convention Against Torture ("CAT").

Petitioner, a native-born Algerian, entered the United States on October 1, 1999, because of a fear of persecution in his homeland. Petitioner stayed in this country longer than authorized and was charged with removability pursuant to 8 U.S.C. § 1227(a)(1)(B). At a hearing before the IJ, Petitioner conceded to the charge of removability but sought asylum, withholding of removal, and withholding of removal pursuant to CAT based on past persecution and a fear of future persecution by the Algerian government and armed insurgent groups.

Petitioner alleged that his persecution began when he discovered wrongdoing by a co-worker at the Public Treasury, a government entity. Petitioner was a computer engineer at the Public Treasury and, as such, was involved in overseeing the security of financial transactions. In August 1997, while reviewing employee computer activities, Petitioner discovered that a co-worker was performing unauthorized transactions. When confronted, the co-worker said he would explain everything later at his house. Petitioner went to the co-worker's house and was met there by two other men who were associated with the Islamic Salvation Front ("FIS"), an armed insurgent organization.

During this meeting, Petitioner was pressured to join the FIS and assist in transferring funds to the Armed Islamic Group ("GIA"), a somewhat-related

armed insurgent group. It was at this time that Petitioner discovered the nature and extent of the co-worker's activities. The co-worker was taking money from accounts at the Public Treasury and diverting it, for a short period of time, to accounts for the insurgent group. Because the money was only transferred for a short period of time, the records at the Treasury would report it as a mistaken transaction, but, in the interim, the transferred funds would garner significant money in interest income for the insurgent organization.

During the meeting, Petitioner was allegedly told by one of the two men that Petitioner and his family would be killed if he did not help in the money-transfer scheme. In addition, the men threatened to punish mercilessly both Petitioner and his family if he reported his co-worker's activities to the government. Afraid to refuse them on the spot, Petitioner asked for time to consider his options. Soon thereafter, he obtained a visa and went to France to think things over. Upon arriving in France, Petitioner decided that it was not safe for him because of the large number of Algerian GIA members living there.

Petitioner next obtained a visitor's visa to the United States. While in the United States, Petitioner determined to write a letter to his supervisor at the Public Treasury to explain his absence and the improper scheme that was occurring at the Treasury. Prior to writing the letter, Petitioner learned from his mother that the two men from the FIS were arrested because of their involvement

in the money-transferring scheme and that these men had implicated Petitioner. In addition, he learned that government agents had been to his house in search of him, did considerable damage to the house, and had beat his brother. After learning of this, Petitioner lost all contact with his family.

The administrative record contains the 1999 State Department's Country Report on Human Rights Practices for Algeria. The Report states generally that Algeria has a poor human-rights record. Of particular importance, the report notes that "[t]he security forces committed extrajudicial killings, routinely tortured or otherwise abused detainees, and arbitrarily arrested and detained, or held incommunicado, many individuals suspected of involvement with armed Islamist groups . . . ." A.R. at 124 (emphasis added). "The Constitution prohibits arbitrary arrest and detention; however, the security forces continued to arrest arbitrarily and detain citizens." Id. at 127 (emphasis added).

> Both the Constitution and legislation ban torture and other cruel, inhuman, or degrading treatment; however, according to local human rights groups and defense lawyers, the police resort to torture when interrogating persons suspected of being involved with, or having sympathies for, armed insurgency groups. There were several credible reports of torture at the Algiers police facility, called Chateau Neuf.

Id. at 126-27 (emphasis added).

Having the above evidence before him, the IJ denied all of Petitioner's requests. In so doing, the IJ found that Petitioner was not subjected to

persecution in the past[1] and that his claim of future persecution by either the government or the FIS was not well-founded because Petitioner lacked credibility.

Petitioner raises three issues on appeal: (1) that the BIA's summary affirmance was unconstitutional as applied, (2) that the IJ failed to support his credibility finding with substantial evidence, and (3) that the IJ's failure to specifically address his CAT claim is reversible error. In addition to countering the above arguments, Respondent contends that Petitioner waived his right to appeal the IJ's credibility finding because Petitioner improperly incorporated by reference this argument in his opening brief. Resp't Br. at 22-23. In light of this Court's order permitting supplemental briefing, combined with Petitioner's short supplemental brief articulating his argument regarding the IJ's allegedly improper credibility finding, the general justifications for not permitting incorporation by reference are not present. See, e.g., Gaines-Tabb v. ICI Explosives, USA, Inc., 160 F.3d 613, 624 (10th Cir. 1998) (explaining that courts generally disfavor incorporation by reference because doing so allows practitioners to circumvent page limitations and complicates the judge's responsibilities). This Court will therefore address Petitioner's credibility argument.

Petitioner's claim that the BIA's summary affirmance procedure is

---

[1]Petitioner did not appeal the IJ's decision that Petitioner was not subjected to persecution in the past. Therefore, this opinion does not address the propriety of that ruling.

unconstitutional as applied to this case is two-fold. First, Petitioner contends that the BIA did not follow its own rules in affirming Petitioner's case without opinion. Second, he argues that the BIA's summary affirmance process does not provide for meaningful review.

Petitioner's first contention, mislabeled as a constitutional argument, is not reviewable by this Court: "[T]he decision to affirm without opinion falls squarely into the category of decisions committed to the agency's discretion and beyond our jurisdiction to review." Tsegay v. Ashcroft, 386 F.3d 1347, 1356 (10th Cir. 2004). Petitioner's second "constitutional" argument ignores the other holding of Tsegay where this Court specifically rejected the petitioner's argument that the BIA's summary affirmance procedure denied her meaningful review. See id. at 1353. We based that decision on Yuk v. Ashcroft, 355 F.3d 1222 (10th Cir. 2004), and reasoned that the IJ's opinion provided the required reasoned agency decision needed to satisfy the Fifth Amendment. Id. That reasoning and holding are equally applicable to this case.

Before addressing the other issues raised by Petitioner in this appeal, a brief background of the laws under which Petitioner sought protection is helpful. "A request for asylum involves a two-step process." Yuk, 355 F.3d at 1232 (quotation omitted). The applicant must first show that he is eligible for asylum by establishing that he is a refugee. See id. Refugee status is statutorily defined

as "any person who is outside any country of such person's nationality . . . who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). If the applicant satisfies that definition, the Attorney General still has discretion either to grant or deny asylum. See id. at 1233. In this case, the IJ determined, at the first step, that Petitioner failed to establish that he was a refugee and, thus, held he was ineligible for asylum.

There are three types of persecution sufficient to support a refugee designation: (1) he has a well-founded fear of future persecution, (2) he suffered past persecution sufficient to give rise to a presumption of future persecution, or (3) he suffered past persecution so severe that it supports an unwillingness on the applicant's part to return to that country. Id. at 1232-33 (internal citations omitted). In this case, Petitioner argues that the IJ's finding that he lacked credibility was not supported by substantial evidence as to his claim for well-founded fear of future persecution. Persecution is "the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive and requires more than just restrictions or threats to life and liberty." Woldemeskel v. INS, 257 F.3d 1185, 1188 (10th Cir. 2001) (citation and

internal quotations omitted).

Asylum is not the only protection offered to applicants who claim some form of persecution in their homeland. To obtain a restriction on removal pursuant to 8 U.S.C. § 1231, an alien must "establish a clear probability of persecution in that country on the basis of race, religion, nationality, membership in particular social group, or political opinion." Elzour v. Ashcroft, 378 F.3d 1143, 1149 (10th Cir. 2004). Differentiating a claim for restriction on removal from asylum is the more demanding standard of proof required for restriction claims. Asylum requires proof of a "well-founded fear" of persecution whereas restriction requires proof that persecution is "more likely than not." Id.; see also INS v. Stevic, 467 U.S. 407, 424 (1984) ("The question under [the clear probability] standard is whether it is more likely than not that the alien would be subject to persecution.").

"The Convention Against Torture provides another basis for restricting removal to a particular country." Elzour, 378 F.3d at 1150. Relief pursuant to CAT requires proof that it is more likely than not that the petitioner will be tortured if removed to that country. 8 C.F.R. § 208.16(c)(2) (2004). The protection provided by CAT is in some aspects broader, but narrower in others, than restriction on removal under 8 U.S.C. § 1231. See Elzour, 378 F.3d at 1150. Although both require petitioner to meet the more-likely-than-not standard, it is

for different purposes; restriction on removal under 8 U.S.C. § 1231 requires proof of persecution on account of a protected class, whereas CAT is not concerned with the reasoning of the persecution, just whether the persecution arises to the level of torture.[2] Id. ("The alien must show that the persecution at issue would be so severe as to rise to the level of torture, but he or she need not show that it would be on account of a protected classification.").

In the instant case, the IJ rejected Petitioner's requests because "his story [did] not have a ring of truth to it, particularly his claim that he fears persecution at the hands of the government because they think he was guilty of these crimes." A.R. at 53. At its core, the IJ's decision is based on an adverse credibility finding. Although classified as a credibility determination, it is important to clarify the IJ's ruling. The IJ stated that Petitioner's story did not have a ring of truth, but, based on the reasons given, it is clear that the IJ was referring to the reasonableness of Petitioner's fear of returning to Algeria, not disbelief in the underlying facts which supported that fear. For example, in support of his finding regarding persecution at the hands of the Algerian government, the IJ stated that the banking scheme reported by Petitioner is not

> ingenious at all and it is something that a modern computer system
> certainly can tap into and find out who is the guilty party. As a result

---

[2]The Code of Regulations provides an in-depth explanation of what constitutes torture under CAT. See 8 C.F.R. § 208.18(a).

> I find it is not credible his assertions that the government is looking for him and that they believe he is responsible because of these two people having reported him.

A.R. at 52.

An IJ's credibility determination is reviewed with deference, but the court must not blindly accept that finding; the IJ must provide specific, cogent reasons for not believing the petitioner. Elzour, 378 F.3d at 1152 (citations and quotation omitted). A proper incredibility determination can be based on inherent inconsistencies in the applicant's testimony, lack of detail, or implausibility of the applicant's story; in addition, it can be based on testimonial demeanor. Id. at 1152-53 (citations omitted).

The only reason cited by the IJ for disbelieving Petitioner in this case is the implausibility of his fear of persecution. "An IJ's finding that an applicant's testimony is implausible may not be based upon speculation, conjecture, or unsupported personal opinion." Id. at 1153. Rather, it must be supported by substantial evidence in the record. Id. at 1150. The IJ gave the following reasons for not crediting Petitioner's testimony: (1) it would be easy for Petitioner to assert his innocence, (2) it was obvious he was not responsible for the crime, (3) it would be easy for him to defend himself by pointing to existing records (the same records that led him to suspect his co-worker of wrong-doing), and (4) it would be easy for the government to discover the guilty party in light of current

-10-

technology.  A.R. at 51-52.  Despite the plethora of reasons given, not one is supported by record evidence.  The IJ's decision was in large part based on the ease in which Petitioner would have been able to assert his innocence by availing himself of the computer records that he used to discover the wrongdoing of his co-worker.  This finding makes several unsupported assumptions and demonstrates a view of the Algerian form of due process inconsistent with that described in the State Department's 1999 report.

The government asserts that, notwithstanding the lack of direct support for the above findings, the IJ can "apply his common sense to Petitioner's testimony describing how the Algerian computer records revealed [the co-worker's] illegal fund transfers[] to find Petitioner not credible . . . ."  Resp't Supp. Br. at 20-21. It is true that it is within the IJ's province to make reasonable conclusions based on facts in the record, and this Court will not disturb those conclusions if supported by the record.

The evidence in the record regarding the Public Treasury's computer system is very brief and vague.  The record does not reveal whether the computer records reviewed by Petitioner to discover the money-transfer scheme still exist. Indeed, the record is vague at best in describing the nature of the hierarchical structure at the Public Treasury and the computer hardware and software system utilized by the institution.  Neither Petitioner nor Respondent presents adequate

evidence as to the interworking of the computer system in place at the Public Treasury. Failure to provide that evidence renders it nearly impossible to make any findings related to the computer system other than those based on pure conjecture. The IJ effectively taking judicial notice of the type and sophistication of the computer system utilized by the Public Treasury is improper. In addition, there is no evidence in the record to support a finding that Petitioner could easily prove his innocence by tracing the illicit transfers to his co-worker. Again, such a conclusion would require a basic understanding of both the hierarchical structure of the Public Treasury and the computer system used, neither of which is adequately found in the record. In addition, based on the rather incomplete record before the IJ, it appears that there is support for Petitioner's fear of future persecution based solely on his being suspected of aiding the FIS. The State Department's report indicates that the government has a history of persecuting and/or torturing those who are suspected–not yet proven guilty–of aiding armed insurgent groups like the FIS.

The fact that the IJ found otherwise demonstrates that he viewed the Algerian form of due process through an American lens. There is ample evidence in the record to support a fear of persecution based on suspicion of allegiance to an armed insurgent group regardless of the truth of the accusations. The realities of Algerian society differ greatly from ours where one is innocent until proven

-12-

guilty. As noted in the State Department's 1999 report: "The security forces committed extrajudicial killings, <u>routinely</u> tortured or otherwise abused detainees, and <u>arbitrarily</u> arrested and detained, or held incommunicado, many individuals <u>suspected</u> of involvement with armed Islamist groups . . . ." A.R. at 124 (emphasis added).

> The IJ also discredited Petitioner's fear of persecution by the FIS:

> The government has been in a death struggle with these groups for many years and it is quite obvious that if they could lay their hands on two people stealing money for their causes, certainly [the government] would give [Petitioner] protection as a witness in the case and protection for his job. They are in the business of trying to eliminate the FIS and GIA and one would think that if they can get information to prosecute them they would do everything they could to protect their source so that in the future other witnesses would not be afraid to come forward.

A.R. at 52-53. Although the State Department's 1999 report on Algeria confirms that the Algerian government has long been at odds with the FIS, <u>see</u>, <u>e.g.</u>, <u>id.</u> at 123, the record contains no other evidence even suggesting, let alone supporting, the IJ's reasons for discrediting Petitioner's fears involving the FIS. There is no evidence in the record to support the IJ's idea that the Algerian government has any form of a witness protection program to encourage citizens to come forward and testify against armed insurgent groups. Although institution of a witness protection program would likely be of some assistance to the Algerian government in its struggle with armed insurgent organizations, there was no

-13-

evidence before the IJ to support a finding of the existence of such a program. Again, it appears that the IJ viewed the state of Algeria's system of due process through an American lens, ignoring the realities faced by Algerian citizens.

The State Department's 1999 report is in direct contradiction to the IJ's finding regarding the government's ability to control the group Petitioner claims to fear:

> Security forces usually reach the sites of massacres too late to prevent or halt civilian casualties. . . . Although the number of security incidents involving armed groups and terrorists decreased significantly[,] . . . these opposition forces committed numerous serious abuses and killed thousands of civilians. . . . [S]uch abuses and killings increased in the second half of [1999]. Armed terrorists continued their widespread campaign of insurgency, targeting government officials . . . .

A.R. at 124.

In sum, this Court finds that the IJ failed to support with substantial evidence his finding that Petitioner lacked credibility. However, in order to provide the agency an opportunity to further explain or supplement the record, we reverse the BIA's decision summarily affirming the IJ's order and remand to the BIA for proceedings consistent with this opinion. See Elzour, 378 F.3d 1154 (internal citations omitted). In light of this Court's decision to remand the case, the Court does not address the IJ's alleged error in not specifically addressing Petitioner's claim under CAT or the government's claim that the IJ's credibility finding precludes review of Petitioner's CAT claim. Included in this Court's

remand order is the direction to not only consider but also specifically address Petitioner's CAT claim.

**REVERSED** and **REMANDED** to the BIA for further proceedings consistent with this opinion.