**F I L E D**

**UNITED STATES COURT OF APPEALS**

**March 16, 2007**

**TENTH CIRCUIT**

MAMADOU AMADOU BA,

     Petitioner,

v.

ALBERTO R. GONZALES[*],

     Respondent.

No. 04-9579

(D.C. No. A96-104-796)

(Petition for Review)

**ORDER AND JUDGMENT**[**]

Before **BRISCOE, McWILLIAMS,** and **TYMKOVICH**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. See Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is, therefore, ordered submitted without oral argument.

---

[*] On February 4, 2005, Alberto R. Gonzales became the United States Attorney General. In accordance with Rule 43(c)(2) of the Federal Rules of Appellate Procedure, Mr. Gonzales is substituted for John Ashcroft as the Respondent in this action.

[**] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Petitioner Mamadou Amadou Ba seeks review of a final order of removal issued by the Board of Immigration Appeals (BIA), which affirmed a decision by an immigration judge (IJ) denying Ba's application for asylum. We exercise jurisdiction pursuant to 8 U.S.C. § 1252(a)(1), grant Ba's petition for review, vacate the final order of removal, and remand for further proceedings.

I.

*Factual background*

Ba was born on June 1, 1960, in Alybayda, Mauritania, a small village located in the Senegal River Valley area of southern Mauritania (near the border of Mauritania and Senegal in northeastern Africa). A.R. at 402. The population of Mauritania is divided into three distinct categories: (1) the Moors, also known as the Beydanes, who are white persons of Arab-Berber descent who have ruled Mauritania since approximately 1960; (2) the black ethnic groups of Halpulaar, Soninke, Wolof, and Bambara; and (3) the Haratines, also known as the black Moors, former black slaves who remain politically and culturally tied to their former masters. Id. at 398. Ba is a member of the Halpulaar ethnic group. Ba was raised on a small farm that was owned by his parents. Id. at 402. As an adult, Ba farmed his parents' land and raised cattle with his parents and wife. Id.

In December 1984, Lieutenant Colonel Maaouiya Ould Sid'Ahmed Taya seized power in a bloodless coup and became President of Mauritania. Id. at 280. The persecution of black ethnic groups escalated following the coup. Id. Beginning in 1989, tens of thousands of black Mauritanians were forcibly expelled and an undeclared

-2-

military occupation of the Senegal River Valley occurred. Id. at 279. In turn, land owned by the expelled black Mauritanians was taken over by white Moors, and the names of many of the villages located in the Senegal River Valley were changed. Id. at 312. Approximately 75,000 black Mauritanians were expelled between 1989 and 1991. Id. at 400.

Ba was among that group. One morning in 1989, three white soldiers came to Ba's house, told Ba he was not Mauritanian, and instructed him to leave. Id. at 403. When Ba refused to leave, the soldiers shot one of his dogs and told him that if he did not listen to them he would be shot too. Id. The soldiers, after hitting him, took him to a military camp in Bang, Mauritania, where he was placed in a small cell and, at times, beaten with belts and kicked. Id. at 140-41. Ba was subsequently removed from the military camp and forced to cross the river into Senegal. Id. at 143. There, Ba was placed in a refugee camp, where he was later joined by his wife and children. Id. at 144. Ba remained in that camp with his family until the summer of 2002. Id. at 145.

During the intervening years, Lieutenant Colonel Taya remained in power in Mauritania. In June 1993, the government of Mauritania declared an amnesty "covering all crimes committed by the armed forces and security forces between April 1989 and April 1992." Id. at 282. In the late 1990's, the Mauritanian government operated a land reform program, "ostensibly to provide land to returnees and other landless families . . . ." Id. at 320. The results of this program were apparently mixed. Id. "Some returnees managed to regain their previous land; some received new property; others failed to

receive compensation of any kind from local authorities." Id. "Returnees have [allegedly] complained that government officials have regularly denied citizenship to returnees." Id.

In August of 2002, Ba, using a passport bearing the name and photo of a friend of his from Senegal, flew from Senegal to New York, New York. Id. at 147. After arriving in New York, Ba stayed for five days in a Brooklyn apartment with some other Fulani-speaking people. Id. at 148-49. He then traveled by bus to Silverthorne, Colorado, where he joined a group of Fulani-speaking people who lived there. Id. at 149-50.

*Procedural background*

On November 22, 2002, Ba filed an application for asylum. On January 9, 2003, the government commenced removal proceedings against Ba. The IJ assigned to the case conducted hearings on the matter on February 11, March 3, and June 16, 2003. At the conclusion of the final hearing, the IJ rendered an oral decision denying Ba's application for asylum and ordering him removed from the United States to Mauritania or, in the alternative, to Senegal.

Ba filed a notice of appeal from the IJ's decision on July 16, 2003. On July 30, 2004, the BIA affirmed, without opinion, the decision of the IJ pursuant to 8 C.F.R. § 1003.1(e)(4) (2003). Ba filed a motion for reconsideration on August 27, 2004. The BIA denied that motion on October 21, 2004. Ba has since filed a petition for review with this court.

*Standard of review*

Because the BIA issued a per curiam decision affirming, without opinion, the IJ's decision pursuant to 8 C.F.R. § 1003.1(e)(4), we review the IJ's decision as if it were the BIA's. Wiransane v. Ashcroft, 366 F.3d 889, 897 (10th Cir. 2004). "The IJ's adverse asylum decision must be upheld if supported by reasonable, substantial and probative evidence on the record as a whole." Id. (internal quotation marks omitted). The IJ's "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary . . . ." 8 U.S.C. § 1252(b)(4)(B).

*Standards for granting application for asylum*

"A request for asylum involves a two-step process." Chaib v. Ashcroft, 397 F.3d 1273, 1277 (10th Cir. 2005) (internal quotation marks omitted). "The applicant must first show that he is eligible for asylum by establishing that he is a refugee." Id. "Refugee status is statutorily defined as 'any person who is outside any country of such person's nationality . . . who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" Id. (quoting 8 U.S.C. § 1101(a)(42)(A)). Refugee status can be established in three different ways: (1) the applicant can show that he has a well-founded fear of future persecution; (2) the applicant can demonstrate that he suffered past persecution sufficient to give rise to a presumption of future persecution; or

(3) the applicant can establish past persecution so severe that it demonstrates compelling reasons for being unwilling to return. Yuk v. Ashcroft, 355 F.3d 1222, 1232-33 (10th Cir. 2004). If the applicant proves refugee status, he must then persuade the Attorney General to exercise his discretion and grant relief. Chaib, 397 F.3d at 1277; see 8 U.S.C. § 1158(b)(1)(A).

*IJ's adverse credibility determination*

Before addressing Ba's challenges to the IJ's decision, we must first address an issue raised by the Attorney General (AG) in his appellate response brief. According to the AG, Ba has rendered his petition for review moot by failing to challenge what the AG characterizes as "the independently dispositive adverse credibility finding" made by the IJ. Aplee. Br. at i. Ba, in his reply brief, denies that the IJ made an adverse credibility finding against him.

During the course of his oral ruling, the IJ made the following comments regarding Ba's testimony:

> In assessing the respondent's testimony, I note that some of the respondent's testimony does not seem to be plausible. The respondent testified that he was aware of what was happening in his home village, although he did not appear to have any way of knowing what was happening in his home village. He indicated that he was aware of one person who had returned from the refugee camp in Mauritania. He testified that the fate of that person was learned because of people standing on one side of the Senegal River looking over to the other side of the Senegal River. I do feel that this rendition of events is far-fetched and implausible. It does indicate that the respondent is willing to embellish his testimony in order to make it appear stronger.
>
> The Court would note that the respondent's testimony is that he left

-6-

Mauritania 14 years ago and he's been living in Senegal since that time. The respondent testified that he had not lived in the capital of Dakar for any significant length of time. However, the respondent's testimony [contradicts] the respondent's asylum application [which states] that he had lived in Dakar from August of 2000 until August of 2002. This would be the last year that the respondent was living in Senegal. The Court believes that this is a significant length of time and that the respondent's inconsistencies cast some doubt on where the respondent was actually living during the past 14 years. The Court would note that the respondent presented a Senegal passport to Senegal authorities upon leaving Senegal. It seems unlikely that the Senegal authorities would have allowed someone to leave their country presenting a false passport. Likewise the respondent indicated that upon entry to Kennedy Airport on August 8, 2002 his passport was accepted as authentic by the immigration authorities there. The acceptance of this passport by examining authorities in Senegal as well as New York City would seem to indicate that the respondent was actually traveling on a valid passport which was issued to him. This is some evidence that the respondent is not from Mauritania as he indicated, but is actually from Senegal. The Court would also note that the respondent has significant residence in Senegal, has children living in Senegal, and so the Court has some questions about the credibility of the respondent's statements regarding his nationality. The respondent presented documents to establish his nationality. However, at least one of the documents appears to have some alteration on it. In an attempt to get an expert opinion as to the validity of the document, the document was submitted to the forensics documents lab for [the] Department of Homeland Security, but no result was obtained, apparently because of the crush of work that that facility is now under. I have no way of knowing whether the documents are authentic or not authentic. As I indicated, there does appear to be an alteration on one of them, and combined with the other embellishments and inconsistencies, the Court is not inclined to grant conclusive weight to those documents.

A.R. at 97-99.

Although we agree that these comments reflect concern on the part of the IJ regarding the truthfulness of some of Ba's testimony, we ultimately conclude that the comments are nothing more than dicta. More specifically, the IJ made no express findings regarding Ba's credibility or nationality, and instead presumed that Ba was

-7-

Mauritanian.  In turn, the IJ based his rejection of Ba's application on the grounds that there had been a significant change in Mauritania's country conditions since 1989, when Ba was allegedly forced out of the country.[1]  Id. at 99.

Our conclusion is bolstered by the following statements made by the IJ to Ba immediately following the oral ruling, in the course of explaining to Ba his right to appeal:

> Okay, now the main reason I denied your application is that many of the papers I have indicate that the situation in Mauritania has changed since 1989 and a lot of people similar to you have gone back to Mauritania.  So even though the situation is not ideal, it was my opinion that you could go back to Mauritania without fearing that you'd be persecuted.

Id. at 197.

Accordingly, we reject the AG's assertion that this appeal has been rendered moot by Ba's failure to challenge the IJ's comments regarding the plausibility of some of his testimony.  See Hartooni v. INS, 21 F.3d 336, 343 (9th Cir. 1994) (remanding where IJ raised doubts about applicant's credibility but made no express adverse credibility finding); Aguilera-Cota v. U.S.I.N.S., 914 F.2d 1375, 1383 (9th Cir. 1990) (indicating that an IJ "must make a[n] . . . explicit and direct finding that" the an asylum applicant "is untruthful"); see also Ikama-Obambi v. Gonzales, 470 F.3d 720,725 (7th Cir. 2006) (concluding that denial of an application for withholding of removal was not warranted

---

[1] The IJ did state that Ba "ha[d] not shown that he me[t] the definition of refugee." App. at 101.  It is unclear, however, whether the IJ based this determination on a finding that Ba was not outside the country of his nationality (i.e., that Ba was Senegalese rather than Mauritanian), or on a finding that Ba was unable or unwilling to return to Mauritania.

-8-

based on lack of corroborating evidence, absent an explicit adverse credibility finding).

*Ba's refugee status: rebuttable presumption of future persecution*

We now turn to Ba's challenges to the IJ's decision. In rejecting Ba's application for asylum, the IJ concluded that Ba failed to establish that he fell within the statutory definition of a "refugee." Ba contends on appeal that, although he established he was subjected to past persecution, the IJ failed to give him the requisite presumption of future persecution. In addition, Ba contends the IJ erred by failing to undertake an individualized assessment of Ba's situation in determining whether that presumption had been rebutted by a fundamental change in country conditions. We address these contentions in order.

*a) Past persecution and presumption of future persecution*

If an asylum applicant has suffered past persecution, he is presumed to have a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1). This presumption can be rebutted if a preponderance of the evidence shows that there has been a fundamental change of circumstances in the applicant's country such that the fear of future persecution no longer is well-founded. 8 C.F.R. § 208.13(b)(1)(i)(A); Woldemeskel v. INS, 257 F.3d 1185, 1189 (10th Cir. 2001). "Fear of persecution is well-founded if it is subjectively genuine and objectively reasonable." Nazaraghaie v. INS, 102 F.3d 460, 462 (1996). Objective reasonableness involves a "reasonable possibility" of suffering persecution on return to the country of persecution. See id. "The Supreme Court has suggested that a one in ten chance may constitute a 'reasonable possibility' of persecution." Id. (quoting

INS v. Cardoza-Fonseca, 480 U.S. 421, 431 (1987)).

The IJ in Ba's case cited to 8 C.F.R. § 208.13(b)(1) at the outset of his oral ruling, noting that where an applicant "establishes past persecution, he is presumed to have a well-founded fear of persecution unless a preponderance of the evidence establishes that country conditions have changed significantly." A.R. at 96. Further, after discussing Ba's testimony and what he viewed as some of the flaws therein, the IJ stated: "Even if the Court were to accept that [Ba] were from Mauritania and is a Fulani person who had suffered as he says, the Court believes that the situation in Mauritania has changed significantly since 1989. The Department of State documents the changes." Id. at 99. As we read these statements, the IJ implicitly found or assumed that (a) Ba had established past persecution, (b) his fear of future persecution was related to his past persecution, (c) he was entitled to and was given the presumption of a well-founded fear of future persecution, and (d) the AG rebutted that presumption based upon information contained in documents from the Department of State. See Diallo v. Gonzales, 178 Fed. Appx. 833, 836 (10th Cir. 2006) (reaching similar conclusion, in case also involving alleged Mauritanian refugee, based upon BIA's citation to 8 C.F.R. § 208.13(b)(1)(i)(A)). Thus, we conclude there is no merit to Ba's assertion that the IJ failed to afford him the rebuttable presumption of a well-founded fear of future persecution.

*b) Rebuttal of presumption of future persecution*

That leaves, however, Ba's assertion that the IJ failed to conduct an individualized assessment of Ba's situation in determining whether the AG had rebutted that

presumption. In determining that the presumption had been rebutted, the IJ cited to two Department of State country reports on Mauritania, one from 2002 and the other from 2001. More specifically, the IJ noted that the 2002 Report indicated that a significant number of people similarly situated to Ba had either returned to Mauritania or resettled in Senegal and Mali, that the government of Mauritania had stated since 1993 that any citizens outside the country could return, and that although 15,000 to 20,000 refugees remained in Senegal, some of those refugees continued to return in small numbers to Mauritania. Id. at 100. The IJ further noted that the 2001 Report indicated that nearly half of the approximately 70,000 people who were expelled from Mauritania between 1989 and 1991 had returned to Mauritania, and that some observers estimated that the actual number of returnees ranged between 40,000 and 65,000. Id. Although the IJ acknowledged that the government leadership in Mauritania remained the same as it was at the time of Ba's expulsion, it concluded that this did not "negate[] a finding that there could have been significant changes in country conditions." Id. at 101.

We agree with Ba that the IJ's analysis was fundamentally flawed. Although we have indicated that "a State Department Report can constitute substantial evidence supporting the IJ's decision," Yuk, 355 F.3d at 1236, we have "cautioned that use of such official report[s] does not substitute for an analysis of the facts of each applicant's individual circumstances. Uncontroverted facts may be inapplicable to or of limited probative value in individual cases and the [IJ] must remain open to this possibility." Krastev v. INS, 292 F.3d 1268, 1277 (10th Cir. 2002) (internal quotation marks omitted).

-11-

Here, the IJ simply relied on general statements in the two country reports, and conducted no individualized analysis to determine (a) whether the conditions in the region where Ba hailed from had actually changed, (b) how many of the refugees who had returned to Mauritania had actually returned to Ba's region, and (c) how many of any such returnees were able to obtain the property and/or identity papers they had been forced to leave behind at the time of their expulsion. See Diallo, 178 Fed. Appx. at 837 (reaching similar conclusion in case involving Mauritanian refugee, where the BIA had relied on generalized statements in a 2001 country report). Moreover, as in Diallo, the IJ "overlooked evidence in the record concerning [Ba's] individual circumstances that is favorable to him." Id. For example, the 2002 Report stated that "serious [human rights] problems remained" in Mauritania. A.R. at 207. That Report further stated "[t]here were a number of reports that some government officials misappropriated land under the land reform system [which was intended to benefit exiled Mauritanians who returned to the country], confiscating the land of southern ethnic groups [of which Ba is allegedly a member] . . . and distributing it to their own friends and family . . . ." Id. at 211. In addition, the Report stated that "[c]ooperation by local authorities addressing restitution and citizenship [of exiled black Mauritanians] varied greatly, depending on individual officials and the returnee's region." Id. at 214. Indeed, the Report noted that "some of those who returned in 1995 ha[d] not yet received identification cards," and as a result "could not travel freely" within the country. Id. Lastly, the Report stated that "[a] number of accounts suggest that some members of the long-dominant White Moor

-12-

community, which traditionally enslaved darker skinned groups, may continue to expect or desire servitude on the part of members of the generally darker-skinned Black Moors and southern ethnic groups [of which Ba is allegedly a member] . . . ." Id. at 219.

In sum, the IJ, "[i]n relying on only general statements as indicators of changed country conditions and ignoring evidence more specifically applicable to [Ba]," "failed to conduct the individualized review that Krastev requires."[2] Diallo, 178 Fed. Appx. at 837. Thus, we conclude that "substantial evidence does not support the [IJ]'s decision, and the matter must be remanded for further proceedings." Id.; see Tambadou v. Gonzales, 446 F.3d 298 (2d Cir. 2006) (vacating BIA's decision affirming IJ's denial of application for asylum from Mauritanian refugee; in doing so, the court rejected the IJ's determination that country conditions had substantially changed); Ndiaye v. Gonzales, 186 Fed. Appx. 61 (2d Cir. 2006) (concluding that state department report discussing conditions in Mauritania was insufficient to establish that, due to changed conditions, alien lacked well-founded fear of future persecution).

We GRANT the petition for review, VACATE the final order of removal, and REMAND for further consideration.

Entered for the Court


Mary Beck Briscoe
Circuit Judge

---

[2] In his second issue on appeal, Ba contends the IJ erred in finding that country conditions in Mauritania had fundamentally changed so that Ba no longer had a well-founded fear of future persecution. For the reasons outlined above, we agree with Ba.